SOUTHERN ROCK, INC. and Key
Constructors, Inc., a Joint
Venture, Plaintiff,

v.

B & B AUTO SUPPLY, Sand Pit and
Trucking Co., Inc., et al., Defendants,

RELIANCE INSURANCE CO.,
Defendant-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 82–2284.

United States Court of Appeals,
Fifth Circuit.

Aug. 11, 1983.

Bernard L. Balkin, Kansas City, Mo., for plaintiff.

Glenn L. Archer, Asst. Atty. Gen., Tax Div., U.S. Dept. of Justice, Michael L. Paup, Chief Appellate Section, Wynette J. Hewett, David I. Pincus, Washington, D.C., for defendants.

Before GEE, REAVLEY and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This appeal from a judgment entered in a statutory interpleader action after decision upon stipulated facts presents two questions: (1) whether the service of a notice of levy on accounts receivable pursuant to I.R.C. § 6331 entitles the government to

priority over a later perfected security interest; (2) whether the recording of a tax lien pursuant to I.R.C. § 6323(f) entitles the government to priority over a simultaneously perfected security interest. Answering both questions against the government, we reverse and remand.

Southern Rock and Key Constructors, a joint venture, contracted in 1977 with the U.S. Army Corps of Engineers to build a seawall in Port Arthur, Texas. Southern Rock subcontracted certain work to B & B Auto Supply. B & B fell behind schedule and was terminated. After deducting damages, however, Southern Rock still owed B & B money for work it had performed. Hearing the footsteps of competing claimants, Southern Rock brought this statutory interpleader. After ordering it to deposit a total of $37,998.72 into the registry of the court, the district court discharged it from further liability.

Of the competing claimants to the fund, two emerged with the strongest claims— Reliance Insurance Co. and the federal government. Reliance, a surety, had entered into an indemnity agreement with B & B and another subcontractor on July 21, 1977. In return for Reliance's execution of payment and performance bonds, B & B and the other subcontractor agreed to indemnify Reliance and assigned their rights under the Corps of Engineers contract and respective subcontracts to Reliance "as collateral security." On May 11, 1978, B & B executed a "security agreement" whereby it granted Reliance a security interest in all its accounts receivable and specifically in the accounts receivable relating to the seawall project. On May 22, 1978, at 8:00 a.m., Reliance filed a financing statement evidencing its security interest in B & B's accounts receivable with the Texas Secretary of State's Office.

The government's claim to the fund arose out of B & B's failure to pay withholding, FICA, and unemployment taxes. On May 19, 1978, the government served a notice of levy on Southern Rock. The notice indicated that B & B owed some $38,008.82. In form language it instructed Southern Rock:

[Y]ou are further notified that all property, rights to property, moneys, credits, and bank deposits *now in your possession* and belonging to this taxpayer ... and all sums of money or other obligations owing from you to this taxpayer ... are hereby levied upon and seized for satisfaction of the aforesaid tax ..., and demand is hereby made upon you for the amount necessary to satisfy this tax liability or for such lesser sum as you may be indebted to this taxpayer to be applied as a payment on this tax liability.

Reliance was not informed of the levy. On May 22, 1978, at 8:00 a.m., the government filed its own notice of lien in the amount of $20,602.27 with the Texas Secretary of State's Office.

Despite the concurrent filing, the district court held that the government was entitled to priority over Reliance for two reasons. First, it determined that the May 19 notice of levy reduced the disputed amount to the government's constructive possession and prevented Reliance from thereafter perfecting its security interest. Second, even if the May 19 levy did not have this effect, the district court concluded that the government was entitled to prevail in a case of simultaneous perfection on May 22. A $20,602.27 judgment was therefore entered in favor of the government.[1] Reliance was awarded the remaining $17,396.45.

Reliance now appeals, urging: (1) that the assignments executed by B & B on July 21, 1977, and April 20, 1978, put the accounts receivable "beyond the reach" of a federal tax levy or lien; (2) that it has a "superpriority" by virtue of I.R.C. § 6323(c); (3) that the notice of levy of May 19 did not perfect the government's interest in the accounts receivable; (4) that the simultaneous filings of May 22 entitle the government to at most a share of the accounts receivable in proportion to its claim.

1. For reasons that the record does not make clear, the government asserted below that it was entitled to only $20,602.27, not the full $38,008.82 amount of the levy.

We turn to these contentions. We recognize that federal law, specifically the tax lien statutes, determines priorities, *see Rice Investment Co. v. United States,* 625 F.2d 565, 568 (5th Cir.1980); *Aquilino v. United States,* 363 U.S. 509, 514, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960), but that those priorities may turn on such questions of state law as whether property existed to which a lien might attach and whether an interest was protected against a later judgment lien, *see Aquilino v. United States,* 363 U.S. at 513, 80 S.Ct. at 1280; I.R.C. § 6323(h)(1).

### Assignment or Security Interest?

Reliance's first argument is that the indemnity agreement of July 21, 1977, and the security agreement of April 20, 1978, gave it full title to B & B's accounts receivable from Southern Rock and therefore left nothing for the government to levy upon or file a lien against. Reliance, in other words, characterizes the arrangement effected by the agreements as an absolute assignment rather than the creation of a security interest. This position is flawed. Generally the test for creation of a security interest is whether "the transaction [was] intended to have effect as security." Tex.Bus. & Comm.Code § 9.102 comment 1. *See also In the Matter of Miller,* 545 F.2d 916, 918 (5th Cir.), *cert. denied,* 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977) (applying Texas law). Here both the specific terms—"collateral security" and "security agreement"—and the overall structure of the two agreements could not be more clear: they were meant to give Reliance a security interest, not to make a complete assignment. Under the agreements B & B retained the right to receive the payments from Southern Rock.

In any event, because "[c]ommercial financing on the basis of accounts and chattel paper is often so conducted that the distinc-

tion between a security transfer and a sale is blurred," Article 9 of the U.C.C. governs *any sale* of accounts except as otherwise provided in the Code. Tex.Bus. & Comm. Code § 9.102(a)(2) & comment 2. Thus, there can be no question that Reliance had to file in order to perfect its interest in the accounts receivable. *Id.* § 9.302(a). In *United States v. Trigg,* 465 F.2d 1264, 1268–69 (8th Cir.1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973), the court applying Arkansas' version of the U.C.C. held that an assignment of accounts receivable "did not place the progress payments beyond the reach of the federal tax lien" where the assignee had not recorded its interest. Similarly, Reliance's failure to file until May 22, 1978, left open the possibility that the government might perfect in the interim. We reject Reliance's first claim of error.

### Superpriority

Reliance also contends that even if there was property as of May 19 or May 22 on which the government could levy or file a lien, it is entitled to superpriority[2] under I.R.C. § 6323(c)(1), which provides:

[E]ven though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—

(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—

\*　　\*　　\*　　\*　　\*　　\*

(iii) an obligatory disbursement agreement, and

(B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.

---

**2.** Some commentators have reserved the term "superpriority" for those priorities established by § 6323(b), which enables a creditor to prime a federal tax lien even if the government was the first to file. The original House Report also followed this practice. H.R.Rep. No. 1884, 89th

Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Ad.News 3722, 3725. We shall adopt Reliance's terminology here, and use the term "superpriority" to refer to its claim of priority under § 6323(c).

Thus, § 6323(c)(1) requires that the written agreement be "an obligatory disbursement agreement." The government points out that neither the indemnity agreement of July 21, 1977, nor the security agreement of April 20, 1978, themselves obligated Reliance to pay out money. The payment and performance bonds did, but they were issued on behalf of another subcontractor, not B & B. This combination of circumstances, the government urges, takes the transaction outside the scope of § 6323(c)(1).

We need not so decide. We simply note that in order for Reliance to be entitled to a superpriority, its interest must be "protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation." As we have already noted, Reliance's interest was not perfected under Texas law until it was filed. Thus, any "superpriority" dates only from May 22. *See* Young, "Priority of the Federal Tax Lien," 34 U.Chi.L.Rev. 723, 737, 755 (1967).

### Effect of a Notice of Levy

■ Having rejected Reliance's two theories as to why its July 21, 1977, and April 20, 1978, agreements with B & B primed the government's notice of levy and lien, we must now determine the effect of the levy of May 19. If a person refuses to pay tax ten days after notice and demand, I.R.C. § 6331(a) authorizes "the Secretary or his delegate to collect such tax ... by levy upon all property or rights to property ... belonging to such person or on which there is a lien provided in this chapter for the payment of such tax." I.R.C. § 6331(b) provides that "[t]he term 'levy' ... includes the power of distraint and seizure by any means." The government argues, and the district court held, that the notice of levy, when served on Southern Rock, gave the government constructive possession of the levied amount and hence priority over any then unperfected secured creditor.

The cornerstone of the government's position is the Supreme Court's decision in *Phelps v. United States,* 421 U.S. 330, 95

S.Ct. 1728, 44 L.Ed.2d 201 (1975). There the Court held that service of a notice of levy on an assignee for the benefit of creditors "created a custodial relationship between the assignee and the United States and thereby reduced the $38,000 to the United States' constructive possession." *Id.* at 334, 95 S.Ct. at 1731. Because possession was held by someone other than the bankrupt for someone other than the bankrupt, the Court concluded that summary jurisdiction over the receiver's claim to the proceeds was lacking. *Id.* at 335–36, 95 S.Ct. at 1731–32.

In *Phelps* there were only two competing claimants to the proceeds—the government and the taxpayer-debtor. The Court calculated that the levy so far established the government's right to the proceeds vis-a-vis the taxpayer-debtor as to deprive the bankruptcy court of summary jurisdiction. But this does not answer the question of whether the government would have been entitled to priority vis-a-vis another secured claimant. In other words, while the levy may have given the government "constructive possession" of the proceeds, the Court did not equate that concept with perfection as against the rest of the world. As the Court emphasized in *Phelps,* it was "concerned not with priority of tax liens but with the effect of a tax levy." *Id.* at 336–37, 95 S.Ct. at 1732. Such a statement would have been out of place had the Court also meant to say that a levy was the equivalent of a filed tax lien. The Court did not intend to say this; rather, its holding was simply that a levy gives the United States "full legal right to the [property] levied upon *as against the claim of the petitioner receiver.*" *Id.* at 337, 95 S.Ct. at 1732 (emphasis added).

A reading of the Supreme Court's recent decision in *United States v. Whiting Pools, Inc.,* —— U.S. ——, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), reinforces this interpretation of *Phelps.* In the course of holding that § 542(a) of the new Bankruptcy Code authorized a bankruptcy court to order the turnover of property that the government had seized to satisfy a tax lien, the Court

reasoned that the enforcement provisions of the Internal Revenue Code "do not transfer ownership of the property to the IRS." *Id.* at ——, 103 S.Ct. at 2316. To the contrary, as the Court put it, the levy and seizure provisions "are provisional remedies that do not determine the Service's rights to the seized property, but merely bring the property into the Service's legal custody." *Id.* at ——, 103 S.Ct. at 2316. The Court emphasized that *Phelps* stands only for "the proposition that the levy gave the Service a sufficient possessory interest to avoid the bankruptcy court's summary jurisdiction." *Id.* n. 18.

Holding that a notice of levy pursuant to § 6331 perfects the government's interest in accounts receivable would, in our view, undermine the purposes of § 6323. Section 6323(a) provides:

> The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lien, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary or his delegate.

Section 6323(h)(1) defines "holder of a security interest" as the holder of an "interest [that] has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation." Thus, under § 6323, a tax lien is not valid as against a perfected security interest until filed in accordance with § 6323(f). Yet if we adopted the government's argument here, a notice of levy would prime a perfected security interest without filing. Under this scenario § 6323 would have little bite.

By contrast, a ruling that a notice of levy cannot accomplish the same purposes as a filed lien would not deprive either of legal significance, but would accord both § 6323 and § 6331 a meaningful role in the tax collection process. As the Supreme Court recognized in *Phelps,* a levy establishes the government's right to property relative to the taxpayer. A person who possesses property on which a levy has been made must surrender that property to the government. I.R.C. § 6332(a). If he fails to do so,

he remains liable to the government for the value of the property and a penalty may be imposed. *Id.* § 6332(c). Having done so, he is freed of any liability to the taxpayer. *Id.* § 6332(d). *See* W. Plumb, *Federal Tax Liens* 245 (3d ed. 1972). Thus, serving a notice of levy provides powerful incentives for the recipient of the notice to turn over the subject property to the government— something that the filing of a lien does not do. But a levy does not, as one leading commentator has noted, "determine whether the taxpayer actually owes the taxes underlying the assessment, lien or levy; *nor does it determine whether the government's rights to the secured property are superior to those of other claimants, such as the taxpayer's other creditors.*" 4 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 111.5.5 (1981) (emphasis added). "The levy must be honored, even if the person in possession of the property has a lien superior to the government's tax lien; surrender of the property does not determine the priority of the liens, which can be settled in another forum." *Id.*

Our concern runs deeper than an aesthetically pleasing construction of the statute. When it levied upon B & B's property, the government served a notice of levy on Southern Rock. But, in contrast to the situation that would have existed had a tax lien been filed, other creditors of B & B had no way of knowing that B & B's accounts receivable were subject to a priority claim. While it is difficult to see any prejudice to Reliance here, since it had decided to extend credit before the levy, the absence of prejudice results more from Reliance's delinquency in filing the financing statement than from the theoretical soundness of the rule proposed by the government.

In *United States v. Jenison,* 484 F.Supp. 747 (D.R.I.1980), the court reasoned along these very lines:

> The government . . . argues that the levy served on the City of Warwick on December 8, 1977, had the effect of seizing the fund for the United States and transferring ownership to the government, thus preventing any subsequent party, such as

GPDC, from asserting a lien against Jenison's interest in the fund. In essence, the government argues that there are two methods by which it can obtain priority over private creditors: one is by filing a notice of tax lien pursuant to § 6323; the other is by serving a notice of levy pursuant to § 6331.

After careful examination of the cases cited by the government in support of this position, I conclude that for the purpose of determining the government's priority over other lien holders, service of a notice of levy is not equivalent to filing a notice of lien.

\*      \*      \*      \*      \*      \*

The only way the government can obtain priority over a judgment lien creditor is by complying with the statutory requirement of 26 U.S.C. § 6323(a), (f) that a notice of lien be filed prior to the creditor obtaining judgment. This requirement is more than mere window dressing; it was enacted to give potential creditors protection against an unrecorded lien. [Citation omitted.] It would be unfair to allow a creditor to pursue its claim to judgment with no notice that the government already had a perfected priority lien on all of the debtor's property.

*Id.* at 755–56, 757.

In *American Acceptance Corp. v. Glendora Better Builders,* 550 F.2d 1220, 1223 (9th Cir.1977), the court held that a notice of a levy "operated as a seizure," and entitled the government to priority over a judgment creditor's lien. The facts of *American Acceptance* are distinguishable from ours: the writ of garnishment had been served after the government had released a tax *lien* by mistake but before it had reinstated it; thus, there was *some* record notice of the

government's claim. But the analysis in *American Acceptance* cannot fairly be reconciled with our conclusion here. It was the Ninth Circuit's view in *American Acceptance* that "[n]o subsequent party could gain any rights in this property from Sovereign [the taxpayer's employer on which the notice of levy had been served] because the property no longer belonged to Sovereign. All rights were held by the IRS." *Id.* at 1222–23. We believe, with deference, that this overreads *Phelps.* As the dissenting judge in *American Acceptance* argued, "Surely, it may be asserted with reason and rationality, that Congress did not intend to leave property rights in a state of limbo and perpetual uncertainty when levies are made and no action is taken by the Government to actively enforce the levy, as in this case." *Id.* at 1223 (Anderson, J., dissenting).[3]

We emphasize the limits of our holding. We are not deciding the effect of a levy *and seizure.*[4] We simply hold that serving a notice of levy on accounts receivable does not by itself entitle the government to priority in those accounts over a subsequently perfecting secured creditor.

### Simultaneous Perfection

■ Having rejected both parties' contentions that they perfected before May 22, we are left with a simultaneous filing and must decide who wins when the race to the recording office ends in a tie.

The statute does not say. Section 6323(a) provides that a tax lien shall not be valid as against a "holder of a security interest," that is, a creditor with a perfected security interest, "until notice thereof . . . has been filed . . ." The section does not indicate whether the tax lien prevails if it is filed at the same time as the "holder of a security

---

**3.** The Ninth Circuit has recently reaffirmed its *American Acceptance* holding in *Chevron U.S.A., Inc. v. United States,* 705 F.2d 1487 (9th Cir.1983). There the court resolved a priority dispute concerning claims to rental payments in favor of the government, even though it had failed to refile its tax lien within the statutory time limit, because it had served a notice of levy which "operated as a seizure." *Id.* at 1489. The court noted that the competing claimant, a purchaser of the right to rental payments, had actual notice of the IRS liens at the time he acquired his interest. *Id.*

**4.** The U.C.C. generally permits a secured party to perfect a security interest by taking possession. Tex.Bus. & Comm.Code § 9.305. It does not, however, permit perfection of an interest in accounts receivable by possession. *Id.* comment 1.

interest" comes into existence. As Judge Goldberg has noted, "Section 6323 certainly was not enacted to decide dead heats among racing lien holders." *Texas Oil & Gas Corp. v. United States,* 466 F.2d 1040, 1052 (5th Cir.1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973).

Reliance argues that, in the absence of guidance from Article 9 of the U.C.C. as well, the common law rule ought to be applied and the fund should be divided in proportion to the claims. The government responds that federal tax liens prime interests that are not clearly "first in time," and, more specifically, that the rule that it prevails in cases of simultaneously *attaching* interests ought to be applied to cases of simultaneously *perfected* interests.

In *MDC Leasing v. New York Property Insurance Underwriting,* 450 F.Supp. 179, 181 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 213, 214 (2d Cir.1979), the court held that "in the event of simultaneous attachment the federal [tax] liens are accorded priority." The facts of the case suggest that the language enveloped simultaneous perfection as well. The court, however, was relying on a pre-Federal Tax Lien Act interpretation of the Internal Revenue Code:

> A federal tax lien takes priority over competing liens unless the competing lien was choate prior to the attachment of the federal lien, *United States v. City of New Britain,* 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1953), or it falls within one of the statutory exceptions carved out by the Internal Revenue Code.

*Id.* at 181.

The Federal Tax Lien Act was enacted in 1966 "to conform the lien provisions of the Internal Revenue Code to the concepts developed in the Uniform Commercial Code" and "to provide some limited but specific relief from the harshness of the choateness rule ..." *Rice Investment Co. v. United States,* 625 F.2d at 569. *See* H.R.Rep. No. 1884, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Ad.News 3722, 3722. We have already held that choateness "has been supplanted by the provisions of § 6323 with respect to tax lien priority questions as to which that statute provides an unambiguous federal law answer." *Aetna Insurance Co. v. Texas Thermal Industries, Inc.,* 591 F.2d 1035, 1038 (5th Cir.1979). In our view, another aspect of choateness that no longer floats, although concededly not specifically addressed by § 6323, is the notion that a tie goes to the government. To the extent that the purpose of the Federal Tax Lien Act was to conform tax liens to Article 9 security interests, the way to achieve this goal is to treat the government like any other creditor. Giving the government's filed tax lien priority over a simultaneously recorded security interest would defeat this goal. We do not believe that is what Congress intended.

In sum, we conclude that the assignments of July 21, 1977, and April 20, 1978, gave Reliance an unperfected security interest in B & B's accounts receivable from Southern Rock. That security interest was perfected on May 22, 1978, at 8:00 a.m., the same time that the government "perfected" its interest in the accounts receivable by filing a notice of lien. In such circumstances, we read § 6323 as requiring Reliance and the government to share in the fund in proportion to their claims.

The record does not indicate the size of Reliance's claim. We note that under § 6323(h)(1), Reliance was a holder of a security interest on May 22 only to the extent that it had then parted with money or money's worth. Thus, Reliance's claim to the proceeds is on a parity with the government's only to that extent, unless it falls within § 6323(c) or § 6323(d). We reverse and remand for further proceedings in conformity with this opinion.

REVERSED and REMANDED.