### In re CHARGE TRUCKING, INC., Debtor.

### Bankruptcy No. 97–43243.

United States Bankruptcy Court, E.D. Texas, Sherman Division.

July 19, 1999.

---

Richard A. Pelley, Sherman, TX, for Debtors.

J. Don Gordon, Hynds & Gordon, Sherman, Mark Weisbart, Trustee, Dallas, TX, for First National Bank of Van Alstyne.

## *OPINION*

DONALD R. SHARP, Chief Judge.

NOW before the Court are pleadings styled "Motion Of First National Bank of Van Alstyne For Relief From Automatic Stay and Second Motion Of First National Bank of Van Alstyne For Relief From Automatic Stay" (the "Motions"). This opinion constitutes the Court's findings of fact and conclusions of law required by Fed.R.Bankr.Proc. 7052 and disposes of all issues before the Court.

## *FACTUAL AND PROCEDURAL BACKGROUND*

Charge Trucking, Inc., (the "Debtor"), initiated the within bankruptcy proceeding by filing a petition for relief under Chapter

7 of Title 11 of the U.S. Code. Thereafter, a Chapter 7 Trustee was appointed. The Debtor operated a commercial trucking business. Previously, over a period of several years, the Debtor had executed five promissory notes and security agreements to the benefit of First National Bank of Van Alstyne ("the Bank") secured by various trucks.[1] In addition, the Debtor executed a promissory note and security agreement to the benefit of the Bank, in the amount of $25,000 to be secured by certain unspecified "accounts, instruments, documents, chattel paper and other rights to payment" (the "$25,000.00 Note"). The $25,000 Note refers to a $15.00 UCC filing fee, however, the Bank admits that it never filed a UCC–1 with respect to the $25,000.00 Note.

The Debtor also entered into a relationship with the Bank under two Business Account Agreements opening a checking account/operating account and an interest bearing savings account referred to by the parties as the "reserve account" pursuant to a Business/Manager Agreement dated January 8, 1997. The Business/Manager Agreement purported to sell the Bank the Debtor's accounts receivable up to the amount of $100,000.00 and allowed the Bank to retain a portion of the sums payable to the Debtor as a reserve. The term of the agreement had not expired as of the date of the filing of the Debtor's petition. The evidence indicates that as of the date of filing $8,606.34 was on deposit with the Bank in the operating account and $11,504.10 was on deposit with the Bank in the reserve account. The Business Account Agreements contain a provision pursuant to which the Debtor agreed that the Bank might setoff the funds in the Debtor's account against any due and payable debt owed to the Bank. The commencement of a bankruptcy proceeding constituted an event of default under the terms of the Business/Manager Agree-

---

1. Five copies of Texas Certificates of Title for the trucks were placed into evidence. Three showed First National Bank of Van Alstyne as

first lienholder. The other two indicate First Bank of Sherman is the first lienholder.

ment the effect of which rendered the Debtor's obligations to the Bank immediately due and payable without notice. (Section 8 of the Business/Manager Agreement; Plaintiff's Exhibit 15). The Bank placed an administrative freeze on both accounts when the petition was filed. The two Motions combined sought the following relief: (1) relief from the automatic stay to allow the Bank to reconvey accounts receivable pursuant to the business manager agreement; (2) relief from the automatic stay to allow the bank to repossess the five vehicles on which it held a lien; and (3) relief from the automatic stay to set-off the amounts in the operating and reserve accounts against debts owed to the Bank at the time of the bankruptcy.

Subsequent to the hearing and in its post-trial brief, the Bank withdrew the request for relief for the purpose of reassigning the accounts receivable to the Debtor so that issue is no longer before the Court. Also subsequent to the hearing, the Chapter 7 Trustee abandoned all interest of the estate in the five trucks and the Debtor and Creditor entered into an agreed judgment allowing relief from the stay and surrendering the trucks to the Bank. Therefore, the only issue left for decision in these combined Motions is the question of whether the Bank can set-off the amounts in the two Bank accounts against prepetition debt.

Objections to the Motions for Relief from Stay were filed by the Debtor, the Chapter 7 Trustee and Investors Mutual of Nueces, Inc. dba Accounts Receivable Funding Corporation (Nueces). Nueces asserted in its objection to the Motion that it held a prior and superior lien on the accounts receivable but it did not appear at the regularly scheduled hearing and has filed no further pleadings. To the extent Nueces maintains an objection, it is over-

ruled for its failure to appear and prosecute.

As to the trucks, there was a great deal of testimony at the hearing concerning value and the balance due on the notes secured by the trucks. The testimony established to the Court's satisfaction that the total balance due on the five individual truck notes plus the balance on a subsequent note in the principal amount of $25,-000.00 is $79,394.43. Events subsequent to the hearing make it unnecessary for the Court to rule on the conflicting value claims. The parties have agreed that relief from the stay should be granted and the trucks have been surrendered to the Bank. Presumably they have now been liquidated and the Bank's deficiency claim, if any, is known to the Bank.

The more difficult and complicated problem in this case deals with the accounts receivable and the transactions between Debtor and the Bank in connection with Debtor's accounts receivables. The Trustee spends a great deal of time in his post-trial brief arguing that the Bank does not have a valid lien on the accounts receivable nor any valid interest in the accounts receivable and that therefore, its claim to set-off should fail. The Trustee may or may not be right concerning the Bank's claim to the accounts receivable but that is not the issue in this hearing. The Bank's request for relief from the automatic stay is not to foreclose on the accounts receivable since the Bank takes the position that the accounts receivable were sold to it prepetition and that the Bank owns the accounts receivable and that they are not part of the bankruptcy estate. The Trustee obviously disputes this position.

■ Article 9 of the Texas Business and Commerce Code applies to any transaction which is intended to create a security interest in accounts and to the sale of any accounts. Tex. Bus. & Com.Code Ann. 9.102(a)(1), (2).[2] Pursuant to § 9.302(a), a

---

**2.** § 9.102. Policy and Subject Matter of Chapter

(a) Except as otherwise provided in Section 9.104 on excluded transactions, this chapter applies

"filing statement must be filed to perfect all security interests except [...]". The exceptions which follow do not apply to the accounts receivable securing the $25,000 Note. This court is bound, when statutory language is unambiguous to interpret statutes according to the clear meaning of their language. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1980). The Bank's argument that Article 9 did not apply to the accounts receivable once the parties entered into the Business Management Agreement is erroneous regardless of whether the Bank characterizes the transaction as a sale, assignment or financing transaction creating a secured interest and also regardless of whether this Court applies the 1997 or the 1994 version of the law. The language of Article 9.102 plainly expresses that Article 9 applies to "any transaction" intended to create a security interest in accounts *and* to any sales of accounts. Subsection (b) includes assignments of the type contemplated under the Business/Management Agreement. See V.T.C.A § 9.102(b). No evidence was presented that would exclude the assignment from the ambit of Section 9.102 and place it under the provisions of Sections 9.103 or 9.104. The evidence presented by the Bank is in disarray as to whether this transaction should be considered a sale or an attempt at a secured lending arrangement. The $25,000.00 note

secured by all of the trucks by virtue of the cross-collateralization clauses also contains a security agreement which recites that it is secured by accounts receivable. Admittedly, that security agreement was never perfected by filing proper UCC documents and in brief the Bank admits that it does not contend that that note is secured by the accounts receivable. The Bank officer who testified at the hearing was unable to explain why a security agreement would have been taken if the Bank's position is that it purchased the accounts receivable and owns them. Additionally, the Business Management Agreement which embodies the transaction between the Debtor and the Bank in regard to the accounts receivable contains both a section providing for sale of all accounts receivable up to $100,000.00 and a subsequent section grants a security interest in all accounts receivable.

This Court has determined that for purposes of this hearing, it does not need to resolve that dispute between the parties since it is not really at issue here. The Trustee has not sought to avoid the transfer and claim those accounts receivables for the benefit of the estate nor has the Bank asked the Court to grant it relief from the stay for purposes of pursuing the accounts receivable. Presumably, the

(1) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts; and also

(2) to any sale of accounts or chattel paper, provided that the application of this chapter to the sale of accounts or chattel paper is not to recharacterize the sale of accounts or chattel paper as a transaction to secure indebtedness but to protect purchasers of accounts or chattel paper by providing a notice filing system.

(b) This chapter applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. This chapter does not

apply to statutory liens except as provided in Section 9.310.

(c) The application of this chapter to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this chapter does not apply.

(d) For all purposes, in the absence of a finding of fraud or intentional misrepresentation, the parties' characterization of a transaction as a sale of accounts or chattel paper shall be conclusive that the transaction is a sale and is not a secured transaction and that title, legal and equitable, has passed to the party characterized as the purchaser of the accounts or chattel paper, regardless of whether the secured party has any recourse against the debtor, whether the debtor is entitled to any surplus, or any other term of the parties' agreement.

Bank continues to try and collect the accounts receivable under the theory that it is the owner of those accounts.

The narrow issue presented to this Court for determination is whether or not the stay provided by 11 U.S.C. § 362 should be modified to allow the Bank to exercise its right of set-off so as to apply the balance in the two accounts it holds against the indebtedness of the Debtor.

In the Bank's post-trial brief, it sets-forth an elaborate theory that the Business Management Agreement is actually an executory contract which the Chapter 7 Trustee had an obligation to either assume or reject and by doing neither it was tacitly rejected under 11 U.S.C. § 365(g) as of the day preceding the filing of the bankruptcy. The Bank reasons that this implicit rejection constitutes a prepetition breech triggering the repurchase obligation contained in the agreement which is equal to the face amount of the accounts receivable purchased by the Bank. That being a prepetition obligation, the Bank reasons, there is a mutuality of debts and it is permitted to off-set the funds it holds against those due it.

■ The Court agrees that the Bank has a right of off-set but not for the reasons argued by the Bank. This is not an executory contract and is not impacted by § 365(g) of the Bankruptcy Code. These are prepetition debts because this was a prepetition transaction. Whether it is characterized as a sale of accounts receivable or the granting of a security interest in accounts receivable, a reading of the Business Management Agreement makes it clear that the economic impact to the Bank and to the Debtor is exactly the same. It was a transfer of accounts receivable to the Bank for which the Bank advanced funds to the Debtor. If those accounts receivable were paid, they liquidated the debt of the Debtor to the Bank. If those accounts receivable went into default, there was an elaborate recourse provision which obligated the Debtor to make the Bank whole by "repurchasing" the ac-

counts receivable. To protect the Bank's position, a certain portion of the funds were paid into a reserve account. Clearly, Courts can look through the particular language of a transaction to the substance of the transaction in determining the rights between the parties. *Hillcrest State Bank v. Bankers Leasing Corp.*, 544 S.W.2d 727, 728 (Tex.Civ.App.—Dallas 1976, *reh.denied*) citing to *Kaufman v. Blackman*, 239 S.W.2d 422, 427 (Tex.Civ.App.—Dallas 1951, writ ref'd, n.r.e.).

■ The Bank is incorrect in its position that it acquired the accounts receivable and that there was some sort of ongoing repurchase obligation which created an executory contract that had to be assumed or rejected upon the filing of bankruptcy. This was a completed transaction prepetition and the parties' rights were fixed in connection with the accounts receivable just as they were in connection with the security interest in the trucks. The only thing unknown to the Bank in connection with both the trucks and the accounts receivable on the date of the filing of the petition was the amount of the deficiency it might have upon liquidation of all collateral it held in the event of default. That does not make the transaction an executory contract it simply means that the liability which clearly exists has not been quantified. Presumably, that quantification has now taken place since all of the accounts receivable held by the Bank (whether as owner or assignee) have been liquidated and the Bank knows exactly what its loss, if any, is. Although the ongoing "repurchase obligation" is defined in the Business Management Agreement as the face amount of all outstanding accounts receivables at all times, the only time the Debtor would ever have been called upon to repay that amount is if all of the accounts receivables had proved to be uncollectible. The Bank's theory that this repurchase obligation is a measure of its damages is simply not tenable.

There is another fatal flaw in the Bank's theory as to it being the absolute owner of the accounts receivable. As demonstrated above, Article 9, § 102 clearly encompasses the sale of accounts receivable within that section of the UCC. Section 9.102(a)(2) clearly states that this *Chapter* applies to sales of accounts. The Legislature has made the entire Chapter applicable to sales which certainly includes all of the filing, recordation and notice provisions and, in fact, the comments state that the express purpose for including sales is for a notice provision to purchasers. Therefore, *in order* for the Bank to have become the absolute owner of the accounts receivable, they would have had to comply with the entire Chapter and they have admitted that they did not do so since no UCC filings were made. *Southern Rock Inc. v. B & B Auto Supply*, 711 F.2d 683, 685 (C.A.1983). Therefore, the Bank's position in this hearing is exactly the same whether it contends that it purchased the accounts receivable or merely took a security interest in them. It is entitled to recover the money it paid to the Debtor for the accounts receivable and to the extent it does not recover that money, it has a deficiency claim against the bankruptcy estate since this entire transaction was conducted prepetition. The question of the Trustee's rights in and to the accounts receivable is not before the Court in this hearing. Leaving aside any rights that the Trustee may have under the strong-arm powers granted in the Bankruptcy Code[3], the relationship between the Bank and the Debtor as to the accounts receivable is clear. The Bank has the right to liquidate those accounts receivable and apply those funds to the indebtedness owed by the Debtor. To the extent there is a deficiency, the Bank has a claim against the Debtor and in the unlikely event that there was an overage, the money should be returned to the Debtor.

This brings us to the crux of this case which is the Bank's request for relief from the stay so that it may exercise its right of set-off as to the money held in the two accounts. The right to offset is a protected right. 11 U.S.C. § 553 provides that:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtor is disallowed;

(2) such claim was transferred, by an entity other than the debtor, to such creditor—

(A) after the commencement of the case; or

(B)(i) after 90 days before the date of the filing of the petition; and

(ii) while the debtor was insolvent; or

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition;

(B) while the debtor was insolvent; and

(C) for the purpose of obtaining a right of setoff against the debtor.

(b)(1) Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(14), 365(h), 546(h), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

---

3. The Court has not made any finding that such an action is appropriate in this case. The Trustee has argued in brief that it has a

superior right to the accounts receivable but that issue is not found in the pleadings

(A) 90 days before the date of the filing of the petition; and

(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

The Court has considered the evidence, argument of counsel and the record in this case. The Court finds that the language of the Business Account Agreements is unequivocal.[4] Each sets forth as follows: "Set–Off You agree that we may (without prior notice and as permitted by law) set off the funds in this account against any due and payable debt owed to us, now or in the future, by the account holder, if the debt arises from a note, 'any due and payable debt' includes the total amount of which we are entitled to demand payment under the note at the time we set off, including any balance the due date for which we properly accelerate under the note." The Court further finds, based upon the credible evidence adduced at trial, that the amounts due to the Bank by Debtor at the time of the filing arose under the Debtor's notes to the Bank, came due prior to the commencement of the case and, regardless of the dollar value of the collateral, the total amount due to the Bank on the date of filing was not less than the amount of $79,394.43.

11 U.S.C. § 533 protects the Bank's right to offset: "Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case." Accordingly, this Court is of the opinion that the Bank is entitled to set off the operating and reserve accounts up to the amount of its allowable claim. However, the Bank has the burden of proving the indebtedness justifying any deductions from a depositor's accounts. *Sears v. Continental Bank*

& *Trust Co.,* 562 S.W.2d 843, 844 (Tex. 1977) *reh. denied.* There is no evidence before this Court of the amount of the Bank's claim against the estate after adjustment by amounts, if any, realized from the sale of its collateral. Therefore, if the parties are unable to agree as to the amount of the claim any one of them may request a hearing at which the parties may present evidence to assist the Court in determining same.

## CONCLUSION

For the foregoing reasons, this Court finds that the Bank has a right of set-off as to the Funds in dispute and the interest accrued thereon up to the amount of its allowed claim against the estate. Any Funds in excess of the amount of the Bank's allowed claim against the estate in the operating and reserve accounts constitute property of the estate which should be turned over to the Trustee promptly. If the parties cannot agree which Funds are the Bank's and which are the property of the estate, any of them may seek an accounting.

---

4. The Trustee's arguments against the Bank's right to offset focus on the Business/Manager Agreement and fail to consider the effect of the executed Business Account Agreement (Plaintiff's Exhibit 18).